UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOSE ELIAS SARMIENTO,

                    Petitioner,

v.

CHRISTIAN PFEIFFER, et al.,

                    Respondents.

Case No.:  20cv0930 WQH (AGS)

**ORDER**

HAYES, Judge:

    Jose Elias Sarmiento ("Petitioner") is a state prisoner proceeding pro se and in forma pauperis with a Second Amended Petition ("SAP") for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254 accompanied by a supplement to the SAP. (ECF Nos. 26, 35.) Petitioner challenges his 2017 conviction in San Diego Superior Court case number SCN346521 for one count of first-degree murder with a lying in wait special circumstance, one count of attempted murder, three counts of shooting at an inhabited house/residence, and five firearm enhancements, and his resultant sentence of life without the possibility of parole plus 153 years to life. (ECF No. 26 at 2; *see also* Lodgment No. 7, Clerk's Tr. ["CT"] 906-09, ECF No. 43-10 at 161-64.)

    Petitioner requests an evidentiary hearing and alleges his federal constitutional rights were violated by: (1) trial court error in excluding an accessory's out of court statements,

1

(2) trial court error in refusing to instruct the jury on third-party culpability, and (3) trial counsel's failure to investigate the facts of the case and research applicable law which deprived Petitioner of a meritorious defense, including failing to call the surviving assault victim, failing to object to and challenge testimony of two witnesses, failing to pursue or investigate the prosecution's alleged possession of clothes worn by Petitioner during the commission of the crime, and failing to subject the prosecution's theory to adversarial testing.[1] (ECF No. 3 at 6-7, 14-27; ECF No. 26 at 3, 11-20.)

Respondent filed an Answer and lodged the trial record. (ECF Nos. 42, 43.) Respondent maintains habeas relief is unavailable because Claims 2 and 3 are untimely and all three claims were reasonably rejected by the state courts. (ECF No. 42 at 2.) Petitioner filed a Traverse, in which he primarily maintains that the state court rejection of his ineffective assistance of counsel contentions was unreasonable, argues an actual innocence exception can permit the merits of Claim 3 to be heard, and again requests an evidentiary hearing. (ECF No. 44.)

## I.    FACTUAL BACKGROUND

The following facts are taken from the state appellate court opinion affirming the judgment in *People v. Sarmiento*, D072571 (Cal. Ct. App. Feb. 28, 2019). (*See* ECF No. 43-1, Lodgment No. 1.) The state court's factual findings are presumptively reasonable and entitled to deference. *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

A. *Events Preceding the Death of Steven Larussa*

Diablos is the most violent and active criminal street gang in the City of Escondido. Diablos has approximately 250 members and is responsible for

---

[1] While the Court construed Petitioner's September 30, 2021, motion to amend as the SAP (*see* ECF Nos. 26, 32), it appears that the filing only contains Claim 3. (*See* ECF No. 26.) While Claims 1-3 were pled in the First Amended Petition ("FAP"), (*see* ECF No. 3), and while Petitioner later withdrew Claims 2 and 3 for the purposes of exhaustion, (*see* ECF No. 17), and re-asserted Claim 3 in the SAP and the supplement to the SAP, it does not appear Claim 2 was specifically reasserted, (*see* ECF Nos. 26, 35.) However, given that Respondent appears to acknowledge that all three claims are presently before the Court and ready for disposition, (*see, e.g.,* ECF No. 42 at 2) and substantively addresses all three claims in the Memorandum of Points and Authorities in Support of the Answer, (*see* ECF No. 42-1 at 12-27), the Court will address all three claims in this Order.

engaging in stabbings, robberies, and shootings, among other offenses. At all times relevant to this case, Sarmiento and Juan Maldonado were active members of Diablos.

In May 2015, Diablos sought to acquire guns to use against a rival Escondido gang. Accordingly, Sarmiento entered into an agreement with a member of a Fallbrook gang to buy four guns for $700. Sarmiento collected money from members of Diablos, which he gave to the Fallbrook gang member. An associate of the Fallbrook gang was supposed to travel to Los Angeles to obtain the guns for the sale, but he returned from Los Angeles without the guns and without Sarmiento's money. Sarmiento made several attempts to recover the money from the Fallbrook gang member who had agreed to sell the guns; however, he was only able to repay a portion of the money, stopped answering his phone, and started evading Sarmiento. Diablos viewed the botched gun sale and the failure to fully repay Sarmiento as a sign of disrespect, both to Diablos and Sarmiento. Sarmiento's then girlfriend, for instance, testified that Sarmiento called the Fallbrook gang member a "punk" because he "wouldn't come through" with the money he owed. Similarly, Maldonado testified that Sarmiento thought the Fallbrook gang member had treated him like a "bitch" and a "punk."

B. *The Death of Steven Larussa*

On June 9, 2015, the Fallbrook gang member contacted Sarmiento and set up a meeting, ostensibly so he could repay the remainder of his outstanding debt. However, Maldonado testified that Sarmiento possessed a gun and planned "to get" the Fallbrook gang member at the planned meeting.

Sarmiento, Maldonado, Jessica Espinoza (Maldonado's girlfriend), and another Diablos gang member named Carlos Soto drove to the Fallbrook gang member's neighborhood that afternoon. Maldonado and Espinoza testified that Maldonado drove the vehicle, Espinoza sat in the front passenger seat, and Sarmiento and Soto sat in the backseat.[2] Maldonado testified that he was wearing a blue or gray shirt with lettering on it and Sarmiento was wearing dark pants and a hat. Surveillance video from a residence in the neighborhood shows Sarmiento wearing dark pants, a hat, and a white rosary. Additionally, surveillance footage from a convenience store in the area filmed shortly before the events at issue shows the driver of the vehicle wearing shorts and a blue shirt with lettering on it and an individual in the backseat wearing a hat and a white rosary.

[2] Espinoza did not testify live at Sarmiento's trial. However, her testimony from the preliminary hearing was read into the record at Sarmiento's trial. All references to Espinoza's testimony shall refer to her preliminary hearing testimony.

After Sarmiento, Maldonado, Espinoza, and Soto arrived in the neighborhood, one of the occupants from the vehicle exited and ducked behind a parked truck, while the remaining occupants parked on a nearby cul-de-sac. A neighbor who witnessed the events testified that the Fallbrook gang member and another male named Steven Larussa were walking down the street and, when they had their backs turned, the individual who had ducked behind the parked truck walked towards the two men and fired several gunshots at them. According to the neighbor, the shooter fired three or four shots and paused before firing a second round of gunshots. Another neighbor testified the gunshots lasted approximately 30 seconds. The Fallbrook gang member escaped the gunfire, but Larussa was struck in the head and killed. The shooter ran back to the vehicle and climbed into the backseat as it sped away.

Maldonado and Espinoza testified that Maldonado was the getaway driver and Sarmiento was the individual who had exited the vehicle and discharged the firearm at the victims. They testified they heard gunshots and witnessed Sarmiento running back to the vehicle claiming he "shot the wrong guy." Sarmiento's defense theory, on the other hand, was that Espinoza was the getaway driver and Maldonado was the individual who had exited the vehicle and fired at the victims.

C. *The Investigation*

Police recovered 10 semi-automatic firearm shell casings from the street, dirt, and sidewalk near where the shooter had crouched behind the parked truck. One bullet passed through the front door of a neighboring residence and lodged in the dining room wall. Another bullet passed through a window of a second neighboring residence. A bullet struck a metal gate in front of a third residence as well, leaving an indentation in the slat of the gate. Larussa's body was discovered in front of the indented metal gate. In addition, police discovered shoe impressions in the dirt near the location of the shooting. Sarmiento owned a pair of skateboard shoes that had length, design, and wear characteristics similar to the shoes that left the impressions at the scene of the shooting.

4

Neighbors and other witnesses testified that the shooter was a Hispanic male who wore a black hat and dark pants or jeans. Four witnesses identified Maldonado as the shooter when presented with a photograph of a lineup that included Maldonado. However, one of the witnesses later identified Sarmiento as the shooter and testified to that effect at trial, another one of the witnesses testified she was not wearing her glasses at the time of the shooting and "didn't get a very good look" at the shooter, a third witness testified he was unsure of his identification of Maldonado, and the fourth witness testified she "did not see the (shooter's) face at all."

D. *The Charges and Pretrial Proceedings*

Sarmiento, Maldonado, Espinoza, and Soto were arrested, and Sarmiento, Maldonado, and Soto were charged by amended information with one count of murder, one count of attempted murder, and three counts of shooting at an inhabited dwelling house. Espinoza was charged with one count of being an accessory to a felony. Additionally, the defendants were charged with various gang and firearm enhancements.

Following her arrest, Espinoza accepted a plea agreement under which she pleaded guilty to being an accessory after the fact with a sentence of up to three years in prison and agreed to enter a witness relocation program. In exchange, the police released Espinoza from custody pending sentencing and dropped the gang enhancement charges pending against her. Espinoza was relocated and placed with her aunt's family. However, while living with her aunt, Espinoza began a sexual relationship with her aunt's son, a minor. After her aunt learned of the relationship, she expelled Espinoza from her home and Espinoza was charged with engaging in sexual intercourse with a minor.

Prior to trial, Maldonado and Soto also accepted plea agreements, leaving Sarmiento as the sole remaining defendant. Under Maldonado's plea agreement, Maldonado pleaded guilty to voluntary manslaughter, having a gun in the vehicle, and a gang enhancement, accepted a prison sentence of 24 years, and agreed to testify during Sarmiento's trial. Maldonado's change of plea form was admitted into evidence and Maldonado testified about the terms of the plea agreement during Sarmiento's trial.

Under Soto's plea agreement, Soto pleaded guilty to assault and accepted a prison sentence of three years. Soto did not testify at Sarmiento's trial, yet one of the prosecution's witnesses testified that all of Sarmiento's codefendants (including Soto) had pleaded guilty.[3] Following this testimony,

Sarmiento sought to introduce Soto's change of plea form into evidence, arguing it was necessary to show that Soto had only pleaded guilty to assault and not a murder-related charge. The trial court denied Sarmiento's request on grounds that the change of plea form was irrelevant and would unduly prolong the trial by permitting the prosecution to call an expert witness regarding the dynamics of the plea process. However, the court offered to strike and instruct the jury to disregard the pertinent portion of the prosecution witness' testimony. Sarmiento's counsel declined the court's offer based on its stated belief that the instruction would draw outsized attention to the prosecution witness' testimony. In accordance with Sarmiento's request, the court did not instruct the jury to disregard the witness' testimony.

[3] Sarmiento concedes the prosecution did not intentionally elicit the testimony regarding Soto's guilty plea from its witness.

(ECF No. 43-1 at 3-8.)

## II.   **RELEVANT PROCEDURAL BACKGROUND**

On May 26, 2017, after trial, a San Diego County jury found Petitioner guilty of one count of first-degree murder in violation of California Penal Code ("CPC") Section 187(a) and found that Petitioner killed the victim by means of lying in wait within the meaning of CPC Section 190.2(a)(15). (CT 1021.) The jury found Petitioner guilty of one count of attempted murder in violation of CPC Sections 187(a) and 664, and found that it was willful, deliberate and premeditated within the meaning of CPC Section 189. (CT 1024.) Petitioner was found guilty of three counts of shooting at an inhabited house/residence in violation of CPC Section 246. (CT 1026, 1028, 1030.) The jury further found true gang enhancements and firearm enhancements with respect to each of the five counts, within the meaning of CPC Sections 186.22(b)(4) and 12022.53(d) and (e)(1), respectively. (CT 1022-31.) On July 28, 2017, the trial court sentenced Petitioner to life without the possibility of parole plus an additional 153 years to life. (CT 906-09.)

On direct appeal to the state appellate court, Petitioner raised five claims—Claims 1 and 2 in this action, as well as three claims not raised in this action. (ECF No. 43-2, Lodgment No. 2.) On February 28, 2019, the California Court of Appeal affirmed the

judgment in a reasoned opinion. (ECF No. 43-1, Lodgment No. 1.) Petitioner thereafter raised four claims in a petition for review in the California Supreme Court, including Claim 1 presented here, along with the three claims not raised in this action. (ECF No. 43-5, Lodgment No. 5.) On June 12, 2019, the California Supreme Court summarily denied the petition in an order which stated in full: "The petition for review is denied." (ECF No. 43-6, Lodgment No. 6.)

On May 13, 2020, Petitioner constructively filed his original federal Petition, ostensibly raising four claims for relief. (ECF No. 1.) On May 28, 2020, the Court dismissed the Petition without prejudice and with leave to amend for failure to satisfy the filing fee requirement, failure to allege exhaustion for any of the four claims, and failure to allege grounds for relief for Claims 2 through 4.[2] (ECF No. 2.) On July 12, 2020, Petitioner constructively filed a First Amended Petition ("FAP"), alleging Claims 1 through 3.[3] (ECF No. 3.) Petitioner further filed a motion for stay and abeyance and a motion for leave to proceed in forma pauperis ("IFP"). (ECF Nos. 4, 5.) On July 30, 2020, the Court granted Petitioner's IFP motion (ECF No. 6), and on July 31, 2020, the Magistrate Judge issued a scheduling order setting a briefing schedule on the motion for stay and abeyance. (ECF No. 9.) On August 24, 2020, Respondent filed a response in opposition, arguing that Claims 2 and 3 were unexhausted and asserting that while Petitioner was not entitled to a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), Petitioner appeared to be entitled to a stay under

---

[2] While the petition is filed-stamped May 18, 2020, the constructive filing date for federal habeas purposes is May 13, 2020, the date Petitioner mailed it to the Court or handed it to correctional officers for mailing to the Court. (ECF No. 1 at 16); *see Huizar v. Carey*, 273 F.3d 1220, 1222 (9th Cir. 2001) ("Under the 'prison mailbox rule' of *Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), a prisoner's federal habeas petition is deemed filed when he hands it over to prison authorities for mailing to the district court.").

[3] While Petitioner indicates he mailed or handed the FAP to correctional officers for mailing on June 12, 2020, (*see* ECF No. 3 at 11), Petitioner indicates he signed the FAP on July 12, 2020, *see id.* at 12. Given the FAP was filed-stamped on July 16, 2020, *see id.* at 1, the constructive filing date appears to be July 12, 2020. As discussed below, both the FAP and the original Petition were filed within the statute of limitations.

*Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003). (ECF No. 11.) On January 7, 2021, the Magistrate Judge issued a Report and Recommendation ("R&R"), recommending that the Court grant Petitioner's motion for a *Kelly* stay and deny Petitioner's motion for a *Rhines* stay. (ECF No. 14.) On February 16, 2021, the Court adopted the R&R in full and directed Petitioner to file a notice of dismissal as to the unexhausted claims (Claims 2 and 3), and after exhausting the claims, file a motion to lift the stay, amend the petition, and demonstrate that the new claims are timely or relate back to those in the pending Petition. (ECF No. 15.)

On March 9, 2021, Petitioner filed a notice of dismissal of Claims 2 and 3. (ECF No. 17.) On June 7, 2021, Petitioner filed a state habeas petition in the California Supreme Court raising Claims 2 and 3. (ECF No. 29 at 5-23.) On August 18, 2021, the California Supreme Court denied the habeas petition, stating in full:

> The petition for writ of habeas corpus is denied. Individual claims are denied, as applicable. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474 [a petition for writ of habeas corpus must include copies of reasonably available documentary evidence]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal].) [¶] Corrigan, J., was absent and did not participate.

(ECF No. 29 at 25, 27.) On September 30, 2021, Petitioner filed a motion to amend, which the Court construed as Petitioner's Second Amended Petition ("SAP"). (ECF Nos. 26, 32.) On November 30, 2021, Petitioner filed another Amended Petition, which the Court construed as a supplement to the SAP. (ECF Nos. 35, 36.) On February 11, 2022, Respondent filed an Answer and lodged the state court record. (ECF Nos. 42, 43.) On March 11, 2022, Petitioner filed a Traverse. (ECF No. 44.)

## III.   PETITIONER'S CLAIMS

Petitioner asserts the following claims:

(1) The trial court erred in excluding an accessory's out of court statements deprived Petitioner of his federal constitutional right to present a defense (ECF No. 3 at 6, 14-21);

(2) The trial court erred in refusing to instruct the jury on a third-party culpability defense, which violated Petitioner's federal constitutional rights to a fair trial and to present a defense, *id.* at 7, 22-27; and,

(3) Trial counsel's failure to investigate the facts of the case and research applicable law, including failing to call the surviving assault victim as a witness, failing to object to and challenge the testimony of two witnesses, failing to investigate the prosecution's alleged possession of clothes worn by Petitioner during the commission of the crime, and failing to subject the prosecution's theory to adversarial testing deprived Petitioner of a meritorious defense and violated his federal constitutional right to the effective assistance of counsel. *Id.* at 28-34; ECF No. 26 at 3, 11-20.

## IV.   <u>DISCUSSION</u>

Respondent maintains habeas relief is unavailable because Claims 2 and 3 are untimely and all three claims were reasonably rejected by the state courts. (ECF No. 42 at 2.) In the Traverse, Petitioner primarily maintains that the state court rejection of his ineffective assistance of counsel contentions was unreasonable, argues an actual innocence exception may permit the Court to hear Claim 3 on the merits, and again requests an evidentiary hearing. (ECF No. 44 at 2, 7-8, 15.)

### A.   <u>Statute of Limitations</u>

This Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). With respect to the statute of limitations, AEDPA provides that:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United

States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

Because Petitioner did not file a petition for certiorari after the California Supreme Court denied his petition for review on June 12, 2019, the statute began to run on September 11, 2019, the day after the ninety-day period elapsed for filing that petition. *See Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999) ("[T]he period of "direct review" in 28 U.S.C. § 2244(d)(1)(A) includes the period within which a petitioner can file a petition for a writ of certiorari from the United States Supreme Court, whether or not the petitioner actually files such a petition."); *see also Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (holding that Federal Rule of Civil Procedure 6(a), which instructs that: "'In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included,'" was applicable to AEDPA's limitation period (quoting Fed. R. Civ. Proc. 6(a))). Without tolling, Petitioner had until September 11, 2020, to timely file a federal habeas petition.

Petitioner bears the burden of demonstrating that the statute of limitations was tolled. *See Banjo v. Ayers*, 614 F.3d 964, 967 (9th Cir. 2010) ("[Petitioner] bears the burden of proving that the statute of limitation was tolled." (citing *Smith v. Duncan*, 297 F.3d 809, 814 (9th Cir. 2002))), abrogated on other grounds by *Pace v. DiGuglielmo*, 544 U.S. 408 (2005); *see also Zepeda v. Walker*, 581 F.3d 1013, 1019 (9th Cir. 2009) ("[Petitioner] bears

the burden of demonstrating that the AEDPA limitation period was sufficiently tolled." (citing *Smith*, 297 F.3d at 814 (footnote omitted))).

Petitioner timely filed his federal Petition on May 13, 2020, and his FAP on July 12, 2020. After the Court granted a *Kelly* stay on February 16, 2021, Petitioner withdrew Claims 2 and 3. After exhausting those claims, Petitioner constructively filed a motion to amend the petition to re-incorporate his newly exhausted claims on September 30, 2021, which the Court construed as the SAP. Respondent contends that Claims 2 and 3 are untimely, Petitioner is not entitled to statutory tolling because he did not file his state habeas petition within the limitations period, is not entitled to equitable tolling, and Petitioner is not entitled to the benefit of the relation back doctrine. (ECF No. 42-1 at 13.) Respondent further asserts that Petitioner fails to offer any evidence to establish that the actual innocence exception is warranted. *Id.* Given that Claims 2 and 3 were exhausted and thereafter re-incorporated into the SAP on September 30, 2021, over a year after the expiration of the AEDPA deadline, without tolling (statutory, equitable, or a combination of the two), a showing that the newly exhausted claims relate back to those in the timely filed petition, and/or a demonstrated exception to the statute of limitations, these two claims are untimely.

### 1.   <u>Statutory Tolling</u>

AEDPA provides for statutory tolling for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). Petitioner constructively filed his state habeas petition on May 30, 2021, after the statute of limitations had expired. (ECF No. 29 at 10.) A state petition filed after the expiration of the limitations period does not provide grounds for statutory tolling. (*See* ECF No. 42-1 at 13 (citing *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003)).) The Court finds Petitioner has not shown statutory tolling is available in this instance.

///

///

### 2. <u>Equitable Tolling</u>

"[Section] 2244(d) is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). However, "[A] 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 649 (quoting *Pace*, 544 U.S. at 418). "Like any equitable consideration, whether a prisoner is entitled to equitable tolling under AEDPA will depend on a fact-specific inquiry by the habeas court which may be guided by 'decisions made in other similar cases.'" *Doe v. Busby*, 661 F.3d 1001, 1011 (9th Cir. 2011) (quoting *Holland*, 560 U.S. at 650).

While Petitioner does not explicitly assert an entitlement to equitable tolling, he indicates he "may have passed his statutory tolling time due to his difficulty in researching case law during the pandemic." (ECF No. 26 at 8.) The Court will consider whether equitable tolling is appropriate due to Petitioner's asserted difficulty in timely researching and preparing his filings due to the pandemic. *See Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) ("Prisoner pro se pleadings are given the benefit of liberal construction." (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam))).

Petitioner timely filed both his federal Petition and the FAP, both of which contained all three claims presently raised in the SAP. Further, the record reflects that Claim 2 had been previously raised on direct appeal and was thus not unknown to Petitioner, (*see* ECF No. 43-2), Petitioner was apprised of both the limitations period and the exhaustion requirement by his appellate counsel in July 2019, (*see* ECF No. 13 at 21-22), and Petitioner had inquired with appellate counsel in 2018 as to some of his Claim 3 allegations of ineffective assistance of counsel, *see id.* at 23-26. Given that Petitioner was aware of the basis of Claims 2 and 3 and of the exhaustion requirement and limitations period by July 2019 at the latest, did not make any attempt to exhaust those claims until after the Court granted the *Kelly* stay in February 2021, and does not demonstrate what kind of difficulties he encountered in researching case law, the Court is unable to conclude that Petitioner "has been pursing his rights diligently" or that "'extraordinary circumstances stood in his way'

and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418); *see Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003) ("The prisoner must show that the 'extraordinary circumstances' were the cause of his untimeliness.'" (quoting *Stillman v. LaMarque*, 319 F.3d 1199, 1203 (9th Cir. 2003))). Petitioner fails to demonstrate he is entitled to any equitable tolling of the statute of limitations.

### 3.   **Relation Back**

Rule 15 of the Federal Rules of Civil Procedure provides: "An amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). However, "[a]n amended habeas petition ... does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650.

The only claim that remained in the FAP after the withdrawal of Claims 2 and 3 for the *Kelly* stay was Claim 1, which asserts trial court error in excluding an out of court statement Espinoza supposedly made to her aunt that the instant murder was not the first time she and Maldonado had killed someone. The newly exhausted Claim 2 alleges trial court error in refusing to instruct on third-party culpability as to Maldonado with respect to the instant murder, which is a wholly separate factual matter in both "time and type." *Mayle*, 545 U.S. at 664. The newly exhausted Claim 3, Petitioner's ineffective assistance of counsel claim, similarly stems from a different set of operative facts than Claim 1. The Court finds Claims 2 and 3 do not relate back to the claim in the FAP. *See King v. Ryan*, 564 F.3d 1133, 1142 (9th Cir. 2009) ("The only sensible interpretation of *Mayle* is that it requires new claims to relate back to claims properly contained in the original petition—that is, those claims that were exhausted at the time of filing.").

///

### 4.   **Actual Innocence**

While a petitioner can overcome a procedural bar to have his claim heard on the merits by satisfying an "actual innocence" exception, "a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995); *see McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations."); *see also Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (en banc) ("[A] credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass through the *Schlup* gateway and have his otherwise time-barred claims heard on the merits."). To bring a credible claim of actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

Petitioner asserts that his case "contains the necessary evidence that demonstrates his actual innocence, meeting the *Schlup* gateway." (ECF No. 26 at 8; *see also* ECF No. 44 at 8 ("[T]he *Schlup* gateway (actual innocence) permits for the merits of his claims to be heard if it is more likely than not that no reasonable juror would have convicted Petitioner in light of the new evidence.").) However, Petitioner does not appear to present any "new" or "reliable" evidence in support of his actual innocence.

Petitioner first asserts trial counsel was ineffective for failing to present testimony from surviving victim Garcia and contends that the "exclusion of material exculpatory declarations of the surviving victim" prevented him from receiving a fair trial and would have "given[n] rise to the inference" that the testimony of prosecution witnesses was perjured. (ECF No. 44 at 8-9.) However, it is unclear how such evidence can be considered

"new" given that Petitioner also asserts trial counsel was aware of the surviving victim at the time of trial and declined to call him as a witness. Further, Petitioner does not demonstrate that Garcia's proposed testimony would be reliable or would establish Petitioner's innocence.

Second, Petitioner generally contends that the discrepancies in the testimony of Espinoza and Maldonado, his two co-conspirators who were charged as accessories to the murder, "demonstrat[e] the information they provided was false." *Id.* at 11. However, Petitioner fails to point to new reliable evidence, such as declarations or recent statements by either witness or any new witnesses, which contradicts the evidence presented at trial.

Finally, Petitioner asserts trial counsel failed to investigate and challenge physical evidence introduced against him, including clothing that the prosecutor stated Petitioner was believed to have been wearing on the day of the shooting. *Id.* at 12. Petitioner contends that the clothes "did not possess proof of guilt" and were "fabricated physical evidence," but acknowledges that neither side has tested the evidence in question, asserting that the prosecutor "did not have the clothes analyzed to substantiate their claim," and noting that Petitioner "does not have the financial resources to hire an expert to analyze clothes and sign a sworn declaration." *Id.* at 12-13. Petitioner has not successfully demonstrated he meets the *Schlup* actual innocence gateway such that his barred claims warrant review on the merits because Petitioner does not offer "new" evidence in support of his claim of actual innocence and instead attempts to undermine the evidence presented at trial with speculative and conclusory allegations about the veracity and import of that evidence. *See Schlup*, 513 U.S. at 329 ("[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.").

### B. Merits

Notwithstanding Petitioner's failure to demonstrate that Claims 2 and 3 are not barred by the statute of limitations, the Court reviews Petitioner's claims on the merits.

A state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits unless the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)). A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004). With respect to § 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.... It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)). "Prisoner pro se pleadings are given the benefit of liberal construction." *Porter*, 620 F.3d at 958 (9th Cir. 2010) (citing *Erickson*, 551 U.S. at 94).

### 1.  **Claim 1**

In Claim 1, Petitioner contends trial court error in excluding an accessory's out of court statements deprived Petitioner of his federal constitutional right to present a defense. (ECF No. 3 at 6, 14-21.) Respondent maintains that "Sarmiento's state-law error claim is not cognizable on federal habeas review, [ ] the California Court of Appeal reasonably determined any error did not violate the federal Constitution," and that "[a]ny error was also harmless." (ECF No. 42-1 at 14-15.)

Petitioner raised Claim 1 in a petition for review in the California Supreme Court which the state court denied without a statement of reasoning. (*See* ECF Nos. 43-5, 43-6.) "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. ___, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption."). In the absence of record evidence or argument seeking to rebut this presumption, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court on direct appeal with respect to Claim 1. *See Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play." (footnote omitted)). The California Court of Appeal rejected Claim 1, stating:

> Prior to trial, Sarmiento's trial counsel and the prosecution each interviewed Espinoza's aunt, the relative with whom Espinoza lived after she accepted her plea agreement and entered a witness relocation program. According to Sarmiento's counsel, Espinoza's aunt stated during the

interview that while Espinoza was staying with her, Espinoza told her "it wasn't the first time that she and (Maldonado) had done something like this," i.e., the killing of another person. During her interview with the prosecution, Espinoza's aunt also stated that Espinoza told her this was not the first time "they" had killed someone. Espinoza did not specify the persons to whom she was referring when she used the pronoun "they" or the persons "they" purportedly had killed.

After this interview, the prosecution filed a motion in limine to preclude Espinoza's aunt from testifying about Espinoza's out-of-court statement on grounds that its relevance was substantially outweighed by the probability of undue prejudice under Evidence Code section 352.[4] The trial court found that although Espinoza's statement potentially could qualify as a statement against penal interest, an exception to the hearsay rule (Evid. Code, § 1230), Espinoza's sexual relationship with her aunt's minor son and her aunt's resultant anger towards Espinoza undermined the reliability of Espinoza's out-of-court statement. Therefore, the court concluded, the statement was only potentially admissible for impeachment purposes. However, the court declined to allow testimony about the statement even for impeachment, reasoning that "piles and piles of impeachment" evidence regarding Espinoza had already been introduced.

[4] Evidence Code section 352 provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

On appeal, Sarmiento contends the trial court's ruling was erroneous because the testimony at issue was admissible not only for impeachment purposes, but also as evidence of Espinoza's involvement in Larussa's killing. According to Sarmiento, Espinoza's out-of-court statement would have tended to show that Espinoza and Maldonado were "more involved in the present offense" than their trial testimony suggested, thereby "weakening the prosecution's case against Sarmiento as the shooter even more." "A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion." (*People v. Dehoyos* (2013) 57 Cal.4th 79, 131.)

We need not decide whether the trial court abused its discretion by limiting the testimony of Espinoza's aunt because, assuming without deciding

such error occurred, there was no resulting prejudice. Sarmiento cites inapplicable federal decisions in support of his contention that we should apply the reasonable-doubt standard discussed in *Chapman v. California*, *supra*, 386 U.S. at p. 24.  (See, e.g., *Webb v. Texas* (1972) 409 U.S. 95, 98 [defendant deprived of due process rights where court gratuitously implied defendant's sole witness would lie]; *Washington v. Texas* (1967) 388 U.S. 14, 19 [defendant deprived of Sixth Amendment rights by statute prohibiting persons charged or convicted as coparticipants from testifying for one another].) However, unlike the decisions cited by Sarmiento, which concerned egregious restrictions on a defendant's ability to present evidence and cross examine witnesses, the ruling in this case did not amount to a complete exclusion of Sarmiento's evidence or impairment of his ability to present a defense. Rather, they constituted standard determinations under Evidence Code section 352, which "do not ordinarily implicate the federal Constitution, and are reviewed under the 'reasonable probability' standard" of *Watson*, *supra*, 46 Cal.2d at p. 836.  (*People v. Gonzalez* (2011) 51 Cal.4th 894, 924; see *People v. Brown* (2003) 31 Cal.4th 518, 545.)

Applying the *Watson* standard of review, we conclude it is not reasonably probable the jury would have reached a result more favorable to Sarmiento had the excluded testimony been introduced. Insofar as the excluded statement was intended to impeach Espinoza, the jury had already been presented with ample evidence from which to conclude that Espinoza's credibility should be discounted. For instance, the court read the transcript of the preliminary hearing, which contained a statement from the court indicating that Espinoza took "long pauses" before answering questions and, "(i)n many instances, (gave) no response." Espinoza's aunt testified to her apparent bias as well. For example, she testified that Espinoza loved Maldonado and would "do anything she had to do" to get him released from prison, including refusing to testify or feigning forgetfulness. The jury also learned that Espinoza spoke directly and indirectly with Maldonado in violation of the terms of her plea agreement. Finally, testimony was presented indicating that Espinoza had lied to police officers about why her aunt had expelled her from her home in order to cover up her improper sexual relationship with her underage cousin. Additional evidence introduced to impeach Espinoza's credibility would have been cumulative and of marginal utility, considering the copious impeachment evidence already presented.

To the extent Sarmiento sought to introduce the statement for its truth, i.e., to show Maldonado and Espinoza were involved in the killing of Larussa, the exclusion of the statement likewise did not prejudice Sarmiento. The

excluded statement ("it wasn't the first time that (Espinoza) and (Maldonado) had done something like this") was consistent with the People's theory that Sarmiento was the shooter, Maldonado was the getaway driver, and Espinoza was an accessory. In fact, Espinoza's aunt even testified at trial that Espinoza told her Maldonado was the getaway driver, Espinoza sat in the passenger seat, and one of the two men seated in the backseat exited the vehicle before gunshots were fired. In addition, compelling evidence supported the jury's verdict, including an eyewitness who identified Sarmiento as the shooter, surveillance footage showing that the shooter and Sarmiento wore the same clothing, the similarities between Sarmiento's shoes and the shoes that left imprints at the scene of the crime, and evidence that Sarmiento had a motive for the crime (the botched gun sale).

Given the nature of the excluded statement, which did not describe the roles of the various codefendants in the shooting at issue, as well as the considerable incriminating evidence pointing to Sarmiento's guilt, it is not probable that Sarmiento would have obtained a more favorable verdict had the excluded testimony been admitted.

(ECF No. 43-1 at 12-15.)

Claims of error in the application of state law are generally not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *see also Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010) ("[V]iolations of state law are not cognizable on federal habeas review."). Here however, Petitioner contends that the failure to admit Espinoza's statement violated his federal constitutional right to present a defense, (*see* ECF No. 3 at 6), which states a cognizable federal claim.

The state court did not decide whether the trial court abused its discretion in excluding Espinoza's aunt's statement, as the court reasoned that even "assuming without deciding such error occurred, there was no resulting prejudice." (ECF No. 43-1 at 13.) Despite Petitioner's contention the state court should apply the federal standard pursuant to *Chapman v. California*, 386 U.S. 18 (1967), the state court declined to do so, on the

basis that "the ruling in this case did not amount to a complete exclusion of Sarmiento's evidence or impairment of his ability to present a defense," but instead "constituted standard determinations under Evidence Code section 352," which warranted review under the state law standard set forth in *People v. Watson*, 46 Cal. 2d 818 (1956). *Id.* at 14. Under *Watson,* "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." *Id.*, 46 Cal. 2d at 836. In contrast, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. "The *Watson* standard is used to review non-constitutional, trial type errors," while "[i]n contrast, the more stringent standard, under *Chapman v. California*, is used to review errors of constitutional magnitude." *Hall v. Haws,* 861 F.3d 977, 989 n.7 (9th Cir. 2017).

While the state court's conclusion appears reasonable, even if Petitioner was able to show that the error alleged implicates federal Constitutional concerns, Petitioner must also demonstrate that the asserted error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

To the extent that the defense intended to introduce the aunt's testimony as additional impeachment against Espinoza, it would have been of limited efficacy given the vast amount of evidence that had already been introduced to impeach Espinoza's credibility. At the outset of her preliminary hearing testimony, which was read into the record at trial, (*see* Lodgment No. 8, Reporter's Tr. ("RT") 1567, ECF No. 43-26 at 34), Espinoza admitted that she was present at the homicide and that she was arrested, charged, made a deal with the prosecution, and pled guilty to being an accessory after the fact. (RT 1568.) Espinoza admitted that her boyfriend Juan Maldonado was present at the homicide, as was Petitioner and the third co-defendant Carlos Soto. (RT 1569-70.) When Espinoza was questioned about going to Fallbrook for a gun deal with Petitioner and Maldonado, the judge stated: "The record will reflect long pauses before. In many instances, no response. In others, a

brief response." (RT 1579.) At another point during Espinoza's testimony, defense counsel asked: "Can the record reflect there was a 22-second gap between when the question was asked and when the witness answered?" to which the judge stated: "The record will reflect it was approximately that time." (RT 1603.) On re-direct examination, the prosecutor at one point indicated to Espinoza that "there was a lot of stuff that you could not remember." (RT 1623.)

Luis Rudisell, who handled Espinoza as a relocated witness as an assigned case investigator, acknowledged that between Espinoza's testimony at a prior hearing and trial testimony, Espinoza had been contacting Maldonado by putting money into his jail account. (RT 1720-21.) Rudisell later learned that Espinoza had committed "criminal" activity, as Espinoza's aunt had kicked her out when she "found some inappropriate text messages between [Espinoza] and her young cousin, male cousin." (RT 1721-22.) When Rudisell spoke to Espinoza's aunt, he was told: "Ms. Espinoza had been having a sexual relationship with her son," and after reading the texts, Rudisell "formed the opinion that a sexual relationship had occurred between Ms. Espinoza and the minor." (RT 1722-23.) While Espinoza initially admitted to the activity on the phone with details, when Rudisell and a colleague interviewed her in person, "she was a lot more reluctant to give specific details and actually tried to downplay it quite a bit." (RT 1725.) Rudisell acknowledged that Espinoza had been charged with two counts of having sexual intercourse with a minor and indicated "[h]er financial assistance was terminated that same month we learned of the crime." (RT 1726.) Rudisell acknowledged that Espinoza's agreement with the prosecutor required her to tell the truth both at trial and when questioned by law enforcement or a judicial officer and to avoid arrest for anything other than minor traffic violations or the agreement would be voided. Rudisell agreed that "molesting a minor is a serious felony violation" and was "not a minor incident at all." (RT 1733-34.) Rudisell acknowledged that Espinoza's arrest was both "a violation of the cooperating agreement" and of "a second agreement that every witness has to enter when they go into the CalWRAP program," the latter of which is an agreement with the state. (RT 1737.) Rudisell also agreed that part of

Espinoza's agreement included not communicating with Maldonado, (*see* RT 1738-39), which Rudisell said took "quite a bit of convincing," (RT 1740.) Moreover, Espinoza only told Rudisell about her communication with Maldonado after he questioned her; she did not reveal it to him otherwise. (RT 1741.) Additionally, Rudisell characterized Espinoza's initial call to him about leaving her aunt's home as "deceptive" as Espinoza only noted that there were "misunderstood" text messages. (RT 1744-45.) Espinoza at first denied any sexual relationship with the minor but admitted it to Rudisell only after being reminded that she needed to tell the truth and after Rudisell told Espinoza that he saw the text messages. (RT 1749-50.) Espinoza again denied the sexual relationship when first asked about it during the in-person interview and attempted to "shift blame towards the minor and downplay the incident." (RT 1751.)

Espinoza's aunt testified that she knew when Espinoza came to stay with her that Espinoza could not have contact with boyfriend Maldonado or his family members, but later discovered that Espinoza was communicating with Maldonado; when confronted, Espinoza said she did not care. (RT 2289-91.) Espinoza received letters from Maldonado through Espinoza's mother. (RT 2291.) Espinoza told her aunt that she wanted to help Maldonado with her testimony and "[t]hat she was going to do anything she had to do to get him to not get time" because "she wanted to be with him" and "loved him." (RT 2292.) Espinoza admitted to her aunt that she was in the car and Maldonado was driving, with two other men in the car and that one got out, she heard shots and the man returned and told them let's go; she told her aunt that while it was planned, she did not know it was going to happen that day. (RT 2296.)

Because Espinoza's credibility had already been impeached in numerous respects, given her clear reticence as a witness, noted failure to recall details and events, admitted motivation to help Maldonado, repeated violations of her agreements with the prosecution and State due to her continuing contact with Maldonado, failure to be truthful with authorities, and criminal activity involving the minor child of her aunt, as well as her admitted knowledge of and involvement in the instant murder leading to her guilty plea as

an accessory, the Court concurs with the state court's finding that additional impeachment concerning Espinoza's alleged involvement in a prior murder would been cumulative and of negligible use in further impeaching Espinoza. (*See* ECF No. 43-1 at 15 ("Additional evidence introduced to impeach Espinoza's credibility would have been cumulative and of marginal utility, considering the copious impeachment evidence already presented.").)

Nor does the Court find any demonstrated prejudice with respect to Petitioner's contention that Espinoza's statement could have shown Espinoza and Maldonado were more involved in the instant killing than they had acknowledged during their trial testimony. The plain meaning of the alleged statements that "it wasn't the first time that she and (Maldonado) had done something like this," and was not the first time "they" had killed someone, indicates that Espinoza and Maldonado been involved in prior killings. However, assuming the truth of the aunt's proposed testimony, Espinoza did not indicate or imply that she and Maldonado had greater involvement in the instant murder than what was presented at trial. Espinoza also told her aunt that Maldonado was the driver, she was present in the passenger seat, one of the two men in the backseat of the vehicle exited before the shooting, she heard shots, and that the man who had exited returned and said let's go. (RT 2296.) The Court is not persuaded that the exclusion of Espinoza's statement amounted to error of a federal constitutional dimension or had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see also Davis v. Ayala*, 576 U.S. 257, 270 (2015) ("[A] prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." (citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007))). Claim 1 does not merit federal habeas relief.

### 2.   **Claim 2**

In Claim 2, Petitioner asserts the trial court erred in refusing to instruct the jury on a third-party culpability defense, which violated Petitioner's federal constitutional rights to a fair trial and to present a defense. (ECF No. 3 at 7, 22-27.) In addition to asserting that Claim 2 is untimely, Respondent maintains that the claim is not federally cognizable and

that the state court reasonably rejected the claim. (ECF No. 42 at 2, ECF No. 42-1 at 20-23.)

Petitioner contends that the trial court's refusal to provide the proposed pinpoint instruction violated his federal constitutional right to present a defense and to a fair trial, (*see e.g.* ECF No. 3 at 22-23), which states a cognizable federal claim. Federal habeas relief may be available on a claim of state instructional error if the error in question "so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "[I]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). Even if constitutional error is found to have occurred, relief remains unavailable unless that error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Additionally, because the instant claim involves an asserted failure to instruct rather than an erroneous instruction, Petitioner bears an "especially heavy burden" to show prejudice from the trial court's decision. *See Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) ("'An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law' and, thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an 'especially heavy burden.'" (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977))).

Claim 2 was raised along with Claim 3 in a habeas petition filed in the California Supreme Court, which denied the petition, stating in full:

> The petition for writ of habeas corpus is denied.  Individual claims are denied, as applicable.  (See *People v. Duvall* (1995) 9 Cal.4th 464, 474 [a petition for writ of habeas corpus must include copies of reasonably available documentary evidence]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal].) [¶] Corrigan, J., was absent and did not participate.

(ECF No. 29 at 25, 27.) Because the California Supreme Court did not specify whether *Duvall*, *Dixon*, or both procedural bars applied to Claim 2, and because in this instance it

appears one or both procedural bars could conceivably apply, state procedural default does not preclude federal habeas review unless all bars are adequate and independent. *See Koerner v. Grigas*, 328 F.3d 1039, 1052 (9th Cir. 2003) (where state court order cites multiple state procedural grounds, of which not all would bar federal review, without specifying which bar or bars apply to which claims and "if it is impossible for the federal court to ascertain whether such grounds have been relied upon, the state court decision cannot bar federal review."); *see also Washington v. Cambra*, 208 F.3d 832, 833-34 (9th Cir. 2000). While the *Dixon* bar has been found to be adequate and independent to bar federal review by both the Supreme Court and Ninth Circuit, *see Johnson v. Lee*, 578 U.S. 605, 609 (2016) and *Johnson v. Montgomery*, 899 F.3d 1052, 1060 (9th Cir. 2018), it is unclear whether *Duvall* is a similarly adequate and independent state rule sufficient to bar federal review, *see, e.g., Kamfolt v. Lizarraga*, No. 17-cv-00970-HSG, 2019 WL 917424, at *6 (N.D. Cal. Feb. 25, 2019) (collecting cases). However, this is ultimately of no consequence, because Respondent, who bears the burden to plead and prove procedural default, does not plead it as an affirmative defense and does not contend federal habeas review is foreclosed on such grounds. *See Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003) ("Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner."). Additionally, because the California Supreme Court's decision was not without comment or citation to authority, the Court will not "look through" the state supreme court's decision to the lengthy reasoned decision by the state appellate court. *See Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply "looks through" them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play.").

It is also unclear whether the state supreme court denied Claim 2 on the merits of the claim. The Supreme Court has stated that there exists a rebuttable presumption that a federal claim was adjudicated on the merits in state court and AEDPA deference applies.

*See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *see also Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). While the Court must credit this presumption, it appears likely the state court's denial rests on state law procedural grounds as opposed to the merits of the claim and AEDPA deference may not apply to Claim 2 given that the California Supreme Court denied the instant state habeas petition with explicit citation to two state procedural bars.

In an abundance of caution, the Court will conduct a de novo review of Claim 2. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a)."). Regardless of whether AEDPA deference applies to Claim 2, to merit habeas relief Petitioner must show that the asserted instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 637; *see Fry*, 551 U.S. at 119 (§ 2254(d) "sets forth a precondition to the grant of habeas relief ..., not an entitlement to it."); *see also Frantz*, 533 F.3d at 735-36.

At trial, the defense requested the following third-party culpability instruction:

You have heard evidence that a person other than the defendant, in this case Juan Maldonado, committed the offense with which the defendant is charged. The defendant is not required to prove Juan Maldonado's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that Juan Maldonado committed the charged offense may by itself leave you with a reasonable doubt as to the defendant's guilt. However, its weight and

significance, if any, are matters for your determination. If after consideration all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty.

You are required to resolve in favor of the defendant any reasonable doubt which you have in the choice between the defendant and Juan Maldonado as the person who committed this crime. Thus, if you have a reasonable doubt as to which person committed the offense you must give the defendant the benefit of that doubt and find him not guilty.

If the evidence permits two reasonable interpretations, one of which points to the guilt of the defendant and the other to the guilt of Juan Maldonado you must reject the interpretation that points to the defendant's guilt and return a verdict of not guilty.

(CT 774.)

During discussion on proposed special jury instructions, the trial court stated:

So that you understand where the Court is coming from, I don't think this is a case of third-party culpability. Mr. Maldonado is not in that traditional sense, even if he is the shooter, as proposed by Mr. Morales. [¶] Mr. Maldonado was before the Court. Was identified to the jury. And that is for them to decide, if he's the shooter or not.

(RT 2432.) After hearing briefly from counsel on the reasons supporting their request for the instruction, the trial court stated: "The third-party culpability instruction is denied." (RT 2433.)

Petitioner contends that "[a]n accused has a fundamental right to have the jury instructed on a particular defense if there is ample evidence to support it," and asserts that the trial court's reasoning that "Juan Maldonado was not a third-party in the traditional sense does not justify his denial of petitioner's constitutional right to a pin point theory," because "[t]he law states there need only be sufficient evidence to support the defense." (ECF No. 3 at 22.)

"A defendant is entitled to an instruction on his theory of the case 'provided that it is supported by law and has some foundation in the evidence.'" *United States v. Del Muro*,

87 F.3d 1078, 1081 (9th Cir. 1996) (quoting *United States v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994)). "However, '[i]t is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory.'" *Id.* (quoting *Dees*, 34 F.3d at 842).

The trial court correctly found that Maldonado was not a "traditional" third-party, as he was originally one of Petitioner's co-defendants, clearly admitted to involvement in the instant crimes, and testified at Petitioner's trial as part of his plea agreement. (*See, e.g.,* RT 1822, 1830-32.) Moreover, evidence supporting Petitioner's defense that Maldonado, rather than Petitioner, was the shooter was presented to the jury. Defense counsel thoroughly cross-examined Maldonado, including questioning him about details of the murder that Maldonado ostensibly would not have known if was simply the driver during the shooting and had remained in the car as he claimed, questioned him on his repeated lies to police prior to his plea deal, his motives in making the plea deal itself, and his failure to recall details, particularly concerning the gun deals he was involved in with Petitioner and Espinoza. (CT 1908-77.) Evidence was also introduced that Espinoza told her aunt she wanted to help Maldonado with her testimony and "[t]hat she was going to do anything she had to do to get him to not get time" because "she wanted to be with him" and "loved him." (RT 2292.)

More importantly, much of the proposed special instruction was duplicative of instructions that were provided to the jury. (*See* ECF No. 43-1 at 17-18.) This included CALCRIM 220, entitled "Reasonable Doubt," which included the instruction that Petitioner be presumed innocent, that the prosecution was required to prove his guilt beyond a reasonable doubt, and that:

> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(CT 793, CALCRIM 220.)  The jurors were further directed that "before you may rely on circumstantial evidence to find a defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty" and "[i]f you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." (CT 797, CALCRIM 224.) The jurors were instructed in detail on how to "judge the credibility and believability of the witnesses," as well as provided a specific instruction on eyewitness identification. (*See* CT 798-800, 807-09, CALCRIM 226, 315, 316.) When instructed that the testimony of one witness could prove a fact, the trial court specifically instructed the jurors that Maldonado and Espinoza were excluded if the jurors concluded they were accomplices and provided further instruction on how to decide if Espinoza and Maldonado were accomplices. (CT 804, CALCRIM 301; *see also* CT 815-17, CALCRIM 334.) The jurors were provided with an instruction on how to evaluate "Conflicting Evidence," which included a caution to consider the evidence and testimony offered, not just the number of witnesses as to any one point or matter. (CT 805, CALCRIM 302.) Finally, the jurors were thoroughly instructed on the elements of the charged crimes.

The primary principles discussed in the proposed special instruction, including reasonable doubt, the burden of proof, and how to evaluate and decide between competing reasonable inferences, were part of the instructions provided to the jury. Petitioner's jury was not precluded from considering Petitioner's defense that Maldonado was the shooter simply because there was an absence of a pinpoint instruction on the matter. Had the jurors believed Petitioner's theory that Maldonado and not Petitioner was the shooter, or had they believed there was reasonable doubt that Petitioner committed the murder, the provided instructions directed an acquittal without the requested pinpoint instruction on third-party culpability. Petitioner fails to bear the "'especially heavy burden'" of demonstrating that the absence of the requested pinpoint instruction "so infected the entire trial that the resulting conviction violates due process." *See Villafuerte*, 111 F.3d at 624 (quoting *Kibbe*,

431 U.S. at 155); *McGuire*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). The Court further is unpersuaded that the trial court's failure to provide the requested pinpoint instruction on third-party culpability had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (1993). Habeas relief is not available on Claim 2.

### 3.   <u>Claim 3</u>

In Claim 3, Petitioner contends that trial counsel's failure to investigate the facts of the case and research applicable law, including failing to call the surviving assault victim as a witness, failing to object to and challenge testimony of two witnesses, failing to pursue or investigate the prosecution's alleged possession of clothes worn by Petitioner during the commission of the crime, and failing to subject the prosecution's theory to adversarial testing, deprived Petitioner of a meritorious defense and violated Petitioner's federal constitutional right to the effective assistance of counsel. (ECF No. 26 at 3, 11-20.) Respondent maintains the state court "reasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting these claims." (ECF No. 42-1 at 23.)

"[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (citing *Strickland*, 466 U.S. at 687). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. To demonstrate prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Claim 3 was raised along with Claim 2 in the habeas petition filed in the California Supreme Court. As with Claim 2, because the state court did not specify whether *Duvall*, *Dixon*, or both procedural bars applied to Claim 3, federal habeas review is not precluded unless all bars are adequate and independent. *See Koerner*, 328 F.3d at 1052 (where state court order cites multiple state procedural grounds, of which not all would bar federal review, without specifying which bar or bars apply to which claims and "if it is impossible for the federal court to ascertain whether such grounds have been relied upon, the state court decision cannot bar federal review."); *see also Cambra*, 208 F.3d at 833-34. However, Respondent bears the burden on this matter and does not plead it as an affirmative defense or contend federal habeas review is foreclosed due to procedural default. *See Bennett*, 322 F.3d at 586.

As with Claim 2, it also remains unclear whether the presumption that the state court denied Claim 3 on the merits has been rebutted. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *see also Williams*, 568 U.S. at 301 ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits— but that presumption can in some limited circumstances be rebutted."). Therefore, in an abundance of caution, the Court will conduct a de novo review of Claim 3. *See Thompkins*, 560 U.S. at 390. However, regardless of whether AEDPA deference applies to Claim 3, to merit habeas relief Petitioner must show "both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." *Mirzayance*, 556 U.S. at 122 (citing *Strickland*, 466 U.S. at 687).

Petitioner first contends that trial counsel failed to "call or personally interview the surviving victim of the assault," Kevin Garcia, alleging Garcia's June 15, 2015, statements

to investigators "contradicts the state's theory, impeaches the credibility of the prosecution's witnesses Juan Maldonado and Jessica Espinoza and casts a vast shadow of a doubt as to the proof of guilt." (ECF No. 26 at 12.) Petitioner contends counsel acted unreasonably in not interviewing Garcia, "due to [counsel's] belief that Garcia's counsel would not allow his client to take the stand" and asserts no deference should be afforded to counsel's judgment "largely because counsel had not personally interviewed the witness and thus did not have an opportunity to assess the credibility of the witness." *Id.*

Petitioner's statements about counsel's decision-making in this respect shed no light on counsel's actual reasoning for the decisions concerning Garcia, and Petitioner has not submitted evidence of counsel's reasoning or lack thereof. The Court must "indulge a strong presumption" trial counsel acted "within the wide range of reasonable professional assistance" in deciding not to pursue Garcia as a potential witness. *See Strickland*, 466 U.S. at 689.

Further, the trial record supports a conclusion that counsel's decisions were reasoned and sound, as the substance of Garcia's statements to investigators, which the defense sought to introduce, are clear from the trial record. (*See* RT 2019 ("There are two areas that I think I'm asking the Court to allow me to elicit, two statements from Kevin Garcia. [¶] One is there was no gun deal with Mr. Sarmiento and he had no problems with Mr. Sarmiento. That's w[h]at he said in those interviews.").) Petitioner fails to show that had defense counsel attempted to conduct an additional interview with Garcia, such an interview would have added to the known information or somehow bolstered Garcia's credibility such that defense counsel would have called him as a witness. It is instead apparent that Garcia, who by all accounts was facing his own murder charges at the time of Petitioner's trial, (*see e.g.* RT 173-74, 523), was not likely to have agreed to an interview, much less been willing to testify at Petitioner's trial. In fact, when the trial court inquired as to whether the defense intended to or anticipated calling Garcia, defense counsel stated "No" and specifically elaborated: "He's currently facing his own issues, and I would assume he would assert his own Fifth Amendment privilege," to which the trial court

concurred, stating: "That's the Court's understanding as well." (RT 173-74.) There is nothing in the record to support a conclusion that Garcia would have been willing to testify at Petitioner's trial (in contrast to the trial record, which reflects he was unavailable), much less that Garcia's prospective trial testimony would have in fact been consistent with the June 15, 2015, statements to investigators.

It is also worth noting that defense counsel attempted, on two other occasions, to try to introduce the contested evidence. At one point during the trial, defense counsel raised the prospect of the prosecution calling Garcia and asked, to no avail, if the prosecution "could offer him 1324 or immunity because we're in search of the truth." (RT 523.) Defense counsel also inquired about potentially introducing Garcia's statements as prior inconsistent statements, which the trial court firmly declined to allow given Garcia had not testified. (RT 2016-21.) Given that the record reflects Garcia was facing charges of his own, it was assumed by the trial court and the parties he would refuse to testify, and he was indeed declared unavailable, it was not unreasonable for trial counsel to seek to introduce Garcia's statements via other means. This strategy appears to fall well within the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."). Petitioner fails to show counsel's performance was constitutionally inadequate with respect to Garcia.

Petitioner appears to separately assert the trial court erred and abused its discretion in granting the prosecution's request to exclude Garcia's statements to investigators. (ECF No. 26 at 12.) As an initial matter, this contention is unexhausted, as Petitioner did not present this argument to the state supreme court in his state habeas petition. (*See* ECF No. 29.) While a reviewing court may not grant habeas relief on an unexhausted claim, it may exercise discretion to deny a claim on the merits despite a petitioner's failure to fully exhaust state judicial remedies. *See* 28 U.S.C. § 2254(b)(2); *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) ("[A] federal

court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim."). Here, because neither the prosecutor nor defense called Garcia as a witness at trial and Petitioner does not attempt to explain why Garcia's statements were admissible or how the trial court abused its discretion in excluding the statements, Petitioner's unexhausted and conclusory contention is denied for lack of merit.

Next, Petitioner contends trial counsel "failed to object and challenge the prosecution's tainted testimonial evidence of Juan Maldonado and Jessica Espinoza," noting their "improper" and "prohibited" communication prior to trial and alleging they offered perjured testimony. (ECF No. 26 at 14-15.) However, Espinoza admitted her communications with Maldonado to both Rudisell and her aunt, as well as her motivation to help Maldonado, and this information was presented to the jury to consider in deciding whether she was a credible witness. (*See* RT 1720-21, 1738-41, 2292.) Petitioner fails to explain how such communication, on its own, demonstrates Espinoza's and Maldonado's testimony was perjured or untrue. While Espinoza's preliminary hearing testimony was read into the record at trial, (*see* RT 1567), and while Espinoza stated that Maldonado was only the getaway driver and that she was in the passenger seat during the shooting, testimony was introduced at trial that Espinoza also told her aunt that she wanted to help Maldonado with her testimony and "[t]hat she was going to do anything she had to do to get him to not get time" because "she wanted to be with him" and "loved him." (RT 2292.) Maldonado also testified at Petitioner's trial and was extensively cross-examined by defense counsel about the truth of his testimony, among other subjects. (*See* RT 1908-77.)

The absence of any evidence that Espinoza and Maldonado colluded to testify falsely, coupled with the impeachment evidence introduced against Espinoza's prior testimony admitted at trial, counsel's extensive cross-examination of Maldonado, and the "strong presumption" this Court must give to counsel's decision-making in this regard, counsel's decision to cross-examine Maldonado rather than challenge the introduction of his and Espinoza's testimony without concrete grounds for such a challenge does not

overcome a presumption that such a course of action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689; *see also Siripongs*, 133 F.3d at 736 ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.")

Petitioner next contends that despite him telling defense counsel that the clothes introduced by the prosecution "were being misrepresented" as evidence of guilt, trial counsel failed to "seek an independent assessment of any expert" nor did he "analyz[e] the clothes for forensic traces of a crime." (ECF No. 26 at 15.) Petitioner contends that an expert "would have been able to testify at trial that there is no scientifically reasonable evidence supporting the prosecutions [sic] accusations." *Id.* at 16. However, Petitioner again fails to submit any declaration, statement, or other documentation as to counsel's decision-making on this matter. Nor does Petitioner offer any specifics as to what type of expert counsel should have been retained, what type of testing could have been done on the clothing, or what testimony any hypothetical expert could have provided. Instead, Petitioner simply notes he "does not have the have the financial resources to hire an expert to analyze clothes and sign a sworn declaration." (ECF No. 44 at 12.)

The trial record demonstrates that the clothing was not scientifically tested and that the evidence introduced was limited to the color and type of clothing worn by the shooter on surveillance video, as compared to that worn by the shooter in witness accounts. For instance, the prosecutor introduced surveillance videos showing that Petitioner, the alleged shooter, was wearing "a dark T-shirt, dark pants, some -- they appear to be Vans-style shoes, dark-colored ball cap" and "a white rosary." (RT 367-69.) A witness testified the shooter "was wearing a gray shirt, jeans, and a black hat," while a separate witness said the shooter was wearing a "Dark blue" or "Black" hat, a "Black and gray" shirt, "dark" or "Black pants" and "Tennis shoes." (RT 626, 729-30.) Police personnel testified witnesses reported the shooter was wearing "dark pants and a dark shirt" as well as a "black hat." (RT 663-64.) Further, during defense counsel's cross-examination, Detective Rodelo admitted that gunshot residue could land on the person or clothing of someone who shot a

36

firearm, acknowledged that the police collected clothing they believed belonged to Petitioner, including Vans shoes, two pairs of jeans, and some shirts, and conceded that the police did not request gunshot residue analysis of those clothing items and no analysis was done in the case. (RT 2260-61.)

It is also apparent from a review of the prosecutor's closing argument that discussion of Petitioner's clothing was limited to pointing out the similarities between the witnesses' descriptions of the shooter, the surveillance videos and stills, and pictures of Petitioner and his attire posted to social media around the time of the shooting. (*See e.g.* RT 2537 ("And then you can see in that video how the Defendant in the backseat, he's messing with some kind a [sic] shirt. You can see that rosary that he's wearing. And you can see him messing with his waistband area. You can clearly see that in the video. And as that car takes off, it appears that he's putting on gloves. That's what it looks like."); RT 2553 (in which the prosecutor notes that in a photo posted to Facebook the day after the crimes "we have the rosary that the Defendant, according to him, never takes off.  And then we have those gray Vans. [¶] So we have the video or -- excuse me -- the still from 487 Adams with those gray Vans, rosary.  Ronco Gas, rosary.  Day after the homicide, rosary, gray Vans."); RT 2543-49 (prosecutor discussing witnesses' descriptions of the shooter).)

Trial counsel acted "within the wide range of reasonable professional assistance" by declining to pursue forensic testing of the clothing and by instead eliciting testimony from the police that they had similarly declined to pursue and conduct gunshot residue testing on the clothing Petitioner ostensibly wore during the crimes. Coupled with Petitioner's failure to provide any insight into counsel's actual decision-making at the time of trial and failure to offer any evidence as to what testing might have shown, the Court cannot conclude trial counsel's performance was constitutionally inadequate. *See Strickland*, 466 U.S. at 689; *see also id.* ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Finally, Petitioner contends that trial counsel was ineffective in failing to object to vouching and improper argument by the prosecutor and thus failing to subject the prosecution's theory to adversarial testing. (ECF No. 3 at 33; ECF No. 26 at 16-17; ECF No. 44 at 13-14.) Specifically, Petitioner contends "[t]he deputy district attorney illegally vouched for the credibility of Juan Maldonado and Jessica Espinoza by bolstering the credibility of their witnesses" and "describes the route those charged allegedly took returning to Escondido but neither of his witnesses described any particular detail regarding an alleged route." (ECF No. 26 at 16-17.) Petitioner offers no affidavit, declaration, or statement from trial counsel as to the reasons for his action or inaction in this regard. Further, the Court's review of the trial record fails to support and, in several aspects, undermines Petitioner's assertions.

First, Petitioner's contention that the prosecutor vouched for the credibility of Espinoza and Maldonado is refuted by a review of the prosecutor's closing argument, in which the prosecutor explicitly tells the jurors that they are not being asked to simply believe the two witnesses, but instead to consider the evidence introduced corroborating the testimony of those two witnesses. (RT 2555 ("So let's -- I'll back up regarding Juan Maldonado and Jessica Espinoza. We know they've lied before. Okay? I'm not asking any one of you to take what they say as the gospel. Absolutely no way. [¶] We only can see what we can verify. Right? And there is so much corroboration left and right of what they said is true.").) Far from vouching for Espinoza's credibility, the prosecutor acknowledged Espinoza had "lied before" and that he did not claim her to be "a good person." (*See* RT 2560 ("Now, we heard from the preliminary hearing of Jessica Espinoza. Right? How do we know that Ms. Espinoza, who is lying in the first hour and a half of that interview, how do we know if she's telling the truth when she got up here in the preliminary hearing about who the shooter was? Because she's lied before. [¶] And I'm not saying Ms. Espinoza is a good person. Quite the contrary. We know what she's done since she was relocated. Or alleged to have done. And I'm not asking -- this is not some popularity contest.").) The prosecutor instead discussed the evidence corroborating Espinoza and Maldonado's

accounts, including both texts and calls from phone records, Facebook, the shoe imprints in comparison to the shoes worn by Maldonado at the time of his arrest and those worn by Petitioner in photos, surveillance videos, and the testimony of other witnesses. (*See* RT 2555-61.)

Second, the Ninth Circuit has held that declining to object during arguments to the jury does not constitute deficient performance under *Strickland*. *See, e.g., United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."). Here, not only does the record fail to reflect that the prosecutor improperly vouched for Maldonado or Espinoza, but Petitioner also fails to show how such a failure to object could have rendered counsel's performance deficient or counsel's assistance ineffective. *See Strickland*, 466 U.S. at 689.

Nor does the record support Petitioner's assertion that the prosecutor advanced improper arguments about the route the car allegedly took. While Petitioner does not provide record citations concerning the challenged argument, a review of the prosecutor's closing argument reflects that during recounting the evidence from the phone records, both texts and calls, and the video surveillance records, at one point the prosecutor noted: "here's the path, a *potential* path of coming back into Escondido." (RT 2567 (emphasis added).) The prosecutor then went on to discuss a potential route the car took before, during and after the shooting, repeatedly citing to phone and video evidence to support the argument. (RT 2567-70.) "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996); *see also Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005) ("The prosecutor may argue reasonable inferences from the evidence presented, which is precisely what he did here." (citing *United States v. Young*, 470 U.S. 1, 8 & n. 5 (1985))). The prosecutor's argument about the "potential path" the car took are based on

reasonable inferences from the evidence and were supported by specific citation to phone and video evidence which had been presented to the jurors during trial.  That defense counsel refrained from objecting to the prosecutor's closing argument falls well within the "wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689; *see also Necoechea*, 986 F.2d at 1281.

Petitioner's claim also fails for lack of prejudice. *See Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." (citing *Strickland*, 466 U.S. at 687)). Petitioner fails to offer any concrete evidence supporting a conclusion Garcia would have been willing to testify at Petitioner's trial, contrary to the trial court's finding of unavailability, or evidence supporting a conclusion that Garcia's prospective trial testimony would have been consistent with his June 15, 2015, statements to investigators. Similarly, Petitioner fails to show any reasonable probability of a different outcome had trial counsel challenged the admission of the testimony of Espinoza and Maldonado because Petitioner fails to provide any evidence Espinoza and Maldonado colluded to testify falsely, Espinoza and Maldonado were each cross examined, and impeachment evidence was introduced against both witnesses. *Id.* As to Petitioner's claim concerning trial counsel's failure to investigate and test the clothes allegedly worn by Petitioner during the murder to challenge their evidentiary value, Petitioner's failure to offer any expert declaration as to the substance of proposed testimony precludes any possible finding of prejudice. (ECF No. 42-1 at 26 (citing *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.")).) Finally, because the record reveals no improper argument or vouching such that any objection by defense counsel would have been sustained, Petitioner cannot demonstrate any "reasonable probability that, but for counsel's" failure to object, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Court is compelled to conclude Claim 3 fails for lack of merit because Petitioner fails to demonstrate either deficient performance or prejudice. *See Mirzayance*, 556 U.S.

at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." (citing *Strickland*, 466 U.S. at 687)). Habeas relief is not warranted on Claim 3.

## C.   Request for Evidentiary Hearing

Petitioner indicates he is "formally seeking and requesting a full evidentiary hearing," citing trial counsel's asserted failures, alleged prosecutorial presentation of false evidence and testimony, and the exclusion of exonerating witness testimony, as alleged in the claims presented in the SAP. (ECF No. 26 at 17-18; see also ECF No. 44 at 2, 15.) However, an evidentiary hearing is unnecessary in this case because the Court has concluded habeas relief is not warranted on any of Petitioner's claims based on a review of the record. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state record.").

## V.   CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254. "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). This requirement includes a district court's decision based on procedural grounds. *See Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 777 (2017) ("[A] litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not 'deserve encouragement to proceed further.'" (quoting *Slack*, 529 U.S. at 484)).

The Court finds that issuing a certificate of appealability is not appropriate as reasonable jurists would not find debatable or incorrect the Court's conclusion that: (1) Claim 1 fails on the merits and (2) Claim 2 and 3 are barred by the statute of limitations and in any event both Claim 2 and 3 fail on the merits under a de novo review, nor does

the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 484.

## VI.   **CONCLUSION AND ORDER**

Based on the foregoing, the Court **DENIES** the SAP, **DENIES** Petitioner's request for an evidentiary hearing, and **DENIES** a certificate of appealability. The Clerk of Court will enter judgment accordingly.

**IT IS SO ORDERED.**

Dated:  November 9, 2022

Hon. William Q. Hayes
United States District Court

20cv0930 WQH (AGS)